IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


NYKA O'CONNOR,
               Plaintiff,

vs.                                     Case No.: 3:09cv224/WS/EMT

M.L. CARNAHAN, et al.,
               Defendants.

_____/

## REPORT AND RECOMMENDATION

      This is an action filed pursuant to 42 U.S.C. § 1983 by Plaintiff Nyka O'Connor ("Plaintiff"), a Florida Department of Corrections ("FDOC") inmate who proceeds pro se and prepaid the filing fee in full.  The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C), and Fed. R. Civ. P. 72(b).  Now before the court is the motion for summary judgment and related exhibits filed by Defendants Randy Agerton ("Agerton"), Shannon Milliken ("Milliken"), Marty Morrison ("Morrison"), Jeannine Moore ("Moore"), Frank Ontko ("Ontko"), and Wayne Green ("Green") (together, "Defendants") (*see* docs. 298, 299, 306 (sealed), & 327; *see also* doc. 336).  Plaintiff has responded (docs. 364, 364-1). Plaintiff has also filed a motion for partial summary judgment (docs. 302), to which Defendants have responded (doc. 333).  Upon consideration, for the reasons given below the court recommends that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

I.      PROCEDURAL HISTORY

The procedural history of this aged case is outlined in Reports entered March 27, 2012, and November 18, 2013, and need not be repeated at length here (*see* docs. 95 and 173, respectively adopted by district court on June 15, 2012, at doc. 103, and January 27, 2014, at doc. 183).[1]  In brief, Plaintiff is currently incarcerated at Union Correctional Institution but was housed at Santa Rosa Correctional Institution ("SRCI") in 2008 when the events giving rise to this action occurred.  The court permitted Plaintiff to amend his complaint three times in an effort to state a viable claim for relief (docs. 7, 47, 86).  On June 15, 2012, on this court's recommendation, the district court dismissed with prejudice the majority of Plaintiff's claims in his Fourth Amended Complaint and dismissed other claims without prejudice; it also authorized Plaintiff to file a Fifth Amended Complaint limited to free speech claims involving the treatment of his mail and related state law claims (docs. 95, 103).  The undersigned rejected Plaintiff's proposed Fifth Amended Complaint (doc. 116), but ordered service of Plaintiff's Sixth Amended Complaint, which is dated October 31, 2012 (respectively, docs. 120, 123).

On January 27, 2014, adopting this court's recommendation, the district court dismissed Plaintiff's claims in the Sixth Amended Complaint as to ten of the named Defendants[2] (doc. 183).  Such dismissal left Plaintiff's claims against the then-unidentified by name and unserved Defendants Agerton, Milliken, Morrison, Moore, Ontko, and Green, who are past and current members of the FDOC Literature Review Committee ("LRC").[3]  After these Defendants were identified and served

---

[1]  The page numbers for the parties' briefs that are cited in this Report refer to numbers assigned by the court's electronic docketing system, rather than those the parties may have designated.

[2]  The Defendants as to whom Plaintiff's claims were dismissed are Kristin Gavin, Jennifer Haas, M. L. Carnahan, Warden Ellis, Sergeant Davis, Correctional Officer Cobbs, Correctional Officer Carmichael, Mailroom Worker Blocker, "LHB," and Michael E. Crews.

[3]  In addition to the claims against the past and present LRC members, Plaintiff's claims against former FDOC Secretary Walter McNeil in his individual capacity remain.  After much delay and difficulty, Defendant McNeil was served in his individual capacity.  On August 19, 2015, Defendant McNeil filed a motion for summary judgment (doc. 372), which remains pending and shall be addressed separately.

with process and discovery concluded, the parties filed their motions for summary judgment and responses.[4]  Both motions are now ripe for review.

II.       RELEVANT ALLEGATIONS AND CLAIMS OF THE SIXTH AMENDED COMPLAINT

Defendants Agerton, Milliken, and Morrison are the current members of the LRC, and Defendants Moore, Ontko, and Green were members of the LRC at the time Plaintiff's claims arose. With respect to these six Defendants, Plaintiff makes the following allegations and claims in the Sixth Amended Complaint.

In October 2008, the LRC approved the "banning" of two texts from The American's Bulletin ("TAB") which had been mailed to Plaintiff and impounded by SRCI mail room staff; the stated basis for the ban was that the publications included "information on how to file fraudulent papers against officials" (doc. 120 at 9, ¶¶ 2, 3).  According to Plaintiff, Defendants' ban "affects ALL FDOC Institutions" (*id.*, ¶ 6) (emphasis in original).  Also, after correctional staff confiscated a TAB newspaper from Plaintiff's cell and impounded it, the LRC approved the "banning" of all incoming TAB materials, thereby prohibiting "ALL FDOC inmates from rec[ei]ving TAB materials" (*id.* at 10, ¶ 13) (emphasis in original).  Plaintiff asserts generally that Defendants have acted "in bad faith, with malicious purpose, exhibited wanton [and] willful disregard for [his] rights and property" (*id.* at 11, ¶ 3).  More specifically, Plaintiff claims that the LRC's ban on TAB materials constitutes an infringement of the rights to free speech under the First Amendment of the U.S. Constitution and under Article 1, § 4 of the Florida Constitution (*id.* at 13, ¶¶ 8a, 8b and at 15, ¶¶ 15a, 15b).[5]  Plaintiff further claims that the LRC's actions violate Fla. Stat. §§ 768.28, 943.13(7), 944.09, and 20.315, and Fla. Admin. Code Rules 33-208.002(3)(a) and 33-501.401 (*id.* at 13, ¶ 8a, ¶ 8b and at 15, ¶ 15b).

---

[4]  Defendants filed some of the exhibits to their motion for summary judgment ex parte and under seal (doc. 306), out of their stated concern that the exhibits contained information that is restricted from inmates.  Upon consideration (*see* docs. 309, 317), the court directed Defendants to prepare a synopsis of the sealed exhibits for submission to Plaintiff (doc. 318).  Defendants served the synopsis on Plaintiff on April 16, 2015 (doc. 327), which synopsis was approved and augmented by the court by order dated April 24, 2015 (doc. 336).

[5]  Plaintiff also asserts that Defendants' conduct constitutes a free speech violation based on the "denial of self-help under UCC [Uniform Commercial Code]" (*see* doc. 120 at 13, ¶ 8a).  The UCC is simply a model uniform act without independent legislative force that was designed to harmonize the laws of sales and certain other commercial transactions among the fifty states.  In some form, all fifty states have adopted the UCC.  Thus, to the extent Plaintiff relies on the UCC to base an independent free speech claim, his reliance is misplaced.  The court finds that Plaintiff's free speech claim under the First Amendment is sufficient to encompass any claim of "denial of self-help under UCC."

As relief, Plaintiff seeks "damages including: punitive, compensatory, nominal[,] Mental/Emotional [sic]" (*id.* at 11).  He also requests declaratory and injunctive relief, costs, attorneys' fees, the appointment of counsel, and any other relief the court deems appropriate (*id.* at 11, 17).

III.   SUMMARY JUDGMENT STANDARD

In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his case or present affirmative evidence that the nonmoving party will be unable to prove his case at trial.  *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*  The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact.  *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005).  "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."  Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him.  *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999).  Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he must prove.  *See* Celotex Corp., 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

"Pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."  Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998); *see also* Loren v. Sasser, 309 F.3d 1296, 1301 (11th Cir. 2002) (stating that "[i]n the summary-judgment context, we construe pro se pleadings more liberally than those of a represented party.").  Nevertheless, "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment."  Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990). Although courts should show leniency to pro se litigants, they should not serve as de facto counsel or "rewrite an otherwise deficient pleading in order to sustain an action."  GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998).

On cross-motions for summary judgment, the court must construe facts and draw inferences "in favor of the party against whom the motion under consideration is made."  Samuelson v. LaPorte Cmty. Sch. Corp., 526 F.3d 1046, 1051 (7th Cir. 2008) (internal quotation marks omitted); *see also* Shaw v. Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004) ("Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."); 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2720 (3d ed. 1998) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.").

IV.    THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

In their motion for summary judgment, Defendants assert that they are entitled to Eleventh Amendment immunity and that federal law does not permit Plaintiff to sue them for compensatory or punitive damages.  They also submit that Plaintiff's First Amendment claim fails when considered under the four-factor test enunciated in <u>Turner v. Safley</u>, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), for assessing the constitutionality of prison regulations; that they are entitled to qualified immunity on this claim; that Plaintiff's state law negligence claims are barred or unauthorized; and that Plaintiff's allegations of statutory and administrative rule violations do not present a private cause of action.[6]  In response, Plaintiff argues that Defendants are not immune from suit; that, at the very least, he is entitled to an award of nominal damages; and that Defendants are not entitled to summary judgment on his First Amendment claim because they failed to supply admissible evidence in support of their arguments.  Plaintiff says little regarding his state law and other claims, noting that the court has addressed—and rejected—the same claims against other Defendants in prior rulings in this case.

Plaintiff seeks partial summary judgment in his favor, apparently arguing that the FDOC has improperly imposed a total ban on all TAB, UCC, and materials with similar content.  According to Plaintiff, such a ban cannot be justified under the <u>Turner</u> factors and is contrary to holdings from other courts, including <u>Jones v. Caruso</u>, 569 F.3d 258 (6th Cir. 2009).  Defendants respond that the FDOC imposes no blanket bans on publications; the rejection of the three publications ordered by Plaintiff does not run afoul of <u>Turner</u>; and Plaintiff's reliance on <u>Jones v. Caruso</u> is misplaced.

## V.    PLAINTIFF'S OBJECTIONS TO DEFENDANTS' EVIDENCE[7]

---

[6] Defendants also argue that Plaintiff has failed to state a claim for relief on his state law fraud claim.  As the court did not locate a fraud claim against any of the instant Defendants in the Sixth Amended Complaint and Plaintiff offers no argument on any such claim at summary judgment, the court does not consider a claim of fraud further in this Report.

[7] Defendants' evidence, in the form of exhibits attached to their motion for summary judgment, includes the following items:

| | |
|---|---|
| Doc. 299-1 | Inmate Population Information Detail |
| Doc. 299-2 | DC5-101 to Douglas Jackson for "ACD Packet—Administrative Claim for Damages" dated August 13, 2008 |
| Doc. 299-3 | DC5-101 to Douglas Jackson for "New Conditional Acceptance for Value for Proof of Claim" dated August 13, 2008 |
| Doc. 299-4 | DC5-101 to Nyka O'Connor dated September 23, 2008 and related informal |

Plaintiff objections to Defendants' motion and evidence include, apparently, that Defendants failed to verify their motion by signing it under penalty of perjury and that their exhibits have not been properly authenticated and/or they contain inadmissible hearsay (doc. 364 at 4–5, 19–22).

First, there was no need for Defendants to personally sign their motion for summary judgment under penalty of perjury. As is proper, Defendants' counsel prepared, signed, and submitted the motion on Defendants' behalf. Also, the motion—which consists primarily of legal arguments and references to evidence—itself is not evidence and thus is not treated as such; attached to Defendants' motion is the summary judgment evidence the court considers. To the extent Plaintiff challenges Defendants' motion for the reasons just identified, the objections are due to be overruled.

---

| | grievance |
|---|---|
| Doc. 299-5 | DC5-101 to Nyka O'Connor dated September 30, 2008 [2 forms] and related informal grievance |
| Doc. 299-6 | Literature Review Committee Action Form for "ACD Packet—Administrative Claim for Damages" [attached pages redacted; *see* doc. 306 (sealed) and synopses at docs. 327, 336] |
| Doc. 299-7 | Literature Review Committee Action Form for "New Conditional Acceptance for Value for Proof of Claim" [attached pages redacted; *see* doc. 306 (sealed) and synopses at docs. 327, 336] |
| Doc. 299-8 | Literature Review Committee Meeting Minutes—October 2, 2008 |
| Doc. 299-9 | DC5-101 to Nyka O'Connor for "The American's Bulletin Sept-Oct '08" dated October 9, 2008 |
| Doc. 299-10 | Literature Review Committee Meeting Minutes—November 6, 2008 |
| Doc. 299-11 | Literature Review Committee Action Form for "American's Bulletin Sept-Oct '08" [attached pages redacted; *see* doc. 306 (sealed) and synopses at docs. 327, 336] |
| Doc. 299-12 | Declaration of Michelle Jordan |
| Doc. 299-13 | "Sovereign Citizens: A Growing Domestic Threat to Law Enforcement," *FBI Law Enforcement Bulletin*, September 2011, FBI Counterterrorism Analysis Section |
| Doc. 299-14 | Extremist Files: Sovereign Citizen Movement, by Southern Poverty Law Center |
| Doc. 299-15 | "'Sovereign' Citizen Kane," by J.J. MacNab, *Intelligence Report*, from Southern Poverty Law Center [redacted] |
| Doc. 299-16 | Literature Review Committee List of Publications Rejected or Approved from December 17, 1991, through December 31, 2011 |

(docs. 299-1–16).

Also, attached to Defendants' response to Plaintiff's motion for partial summary judgment are Ms. Jordan's resubmitted declaration (doc. 333-1, at 1–4); a list of all publications that the LRC reviewed from December 17, 1999, through December 31, 2011, and either approved or rejected (doc. 333-1, at 5–8); and copies of orders entered in O'Connor v. Antony, Case No. 2013 CA 000272 (Fla. 5th Jud. Cir., Jul. 22, 2013) (doc. 333-1 at 9–11); O'Connor v. Oliver, Case No. 2012 CA 002209 (Fla. 2d Jud. Cir., Nov. 22, 2013) (doc. 333-1 at 12–13); and Bondi v. Salmonson, Case No. 2013 CA 303 (Fla. 2d Jud. Cir., Apr. 15, 2015) (doc. 333-1 at 14–16).

Next, Defendants' evidence should not be rejected on the grounds it has not been properly authenticated or contains inadmissible hearsay.  The general rule regarding the consideration of hearsay statements included in verified pleadings, affidavits, documents, and other materials submitted pursuant to Rule 56 is that inadmissible hearsay, meaning out-of-court statements presented for the purpose of establishing the truth of the content of the statement and that do not fall within an exception to the hearsay rule, may not be considered on a motion for summary judgment. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation omitted).  The court may, however, consider a hearsay statement if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form." *Id.* at 1323 (quoting Wright v. Southland Corp., 187 F.3d 1287 (11th Cir. 1999); Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996); McMillian v. Johnson, 88 F.3d 1573, 1584–85 (11th Cir. 1996)); *see also* Rule 56(c)(2), Fed. R. Civ. P. (explaining that proper objection that a fact is not supported by admissible evidence is that "a fact cannot be presented in a form that would be admissible in evidence").  Thus,

> the out-of-court statement . . . must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, [FN14] or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted, [FN15] or is used solely for impeachment purposes (and not as substantive evidence). [FN16]

Macuba, 193 F.3d at 1323–24 (footnotes omitted).

Defendants' evidence is largely made up of FDOC records.  A certificate of authenticity from a records custodian or other qualified witness customarily is supplied with this type of record, *see* Fed. R. Evid. 902(11), but the court could not locate any such certificate from Defendants. Regardless, the prison records' authenticity cannot reasonably be argued.  *See*, e.g., Fryman v. Traquina, No. CIV 07–2636 JAM DAD, 2009 WL 113590, at *11 n.5 (E.D. Cal. Jan. 15, 2009) (overruling objections to prison records, brought in part on ground of lack of authentication, because "[i]t cannot reasonably be disputed that the records in question are plaintiff's medical records from his prison file.  Those records are created and maintained by prison officials.").  Moreover, the FDOC records should be admissible under the business records hearsay exception found in Federal

Rule of Evidence 803(6), *see* Ellis v. Capps, 500 F.2d 225, 226 n.1 (5th Cir. 1974)[8] (finding prison records admissible as official records), and Plaintiff has raised no objection to the records' trustworthiness.  *See* Fed. R. Evid. 803(6)(E) (requiring party opposing admission of evidence to show that the source of information or the method or circumstances of preparation indicates a lack of trustworthiness).  Indeed, Plaintiff also relies on certain FDOC prison records (*see* doc. 302 at 25–32, 34), some of which are the same records as those cited by Defendants (*see id.* at 12–15, 17–18 and docs. 299-5, 299-9).  For the foregoing reasons, the court concludes that the FDOC prison records submitted by Defendants (docs. 299-1–11, 299-16, & 333-1, at 5–8) (as well as those submitted by Plaintiff, although Defendants make no objection to them) are admissible under the business records hearsay exception found in Federal Rule of Evidence 803(6).  Thus, Plaintiff's authentication and hearsay objection to Defendants' FDOC prison records should be overruled.

The *FBI Law Enforcement Bulletin* and Southern Poverty Law Center articles supplied by Defendants as exhibits to their motion discuss the "sovereign citizens" movement (docs. 299-13–15).[9]  Insofar as these are periodical or newspaper articles, they should be self-authenticating.

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

[9] Courts, including this court, are well-familiar with the tenets and practices of the sovereign citizens movement.  For example, in Monroe v. Beard, 536 F.3d 198 (3d Cir. 2008), the court explained that adherents of the sovereign citizens movement file

> [fraudulent] financing statements under Article 9 of the UCC, which sets forth a process for perfecting security interests in property.  These liens and judgments, accessible on financing statement forms, are easy to file.  Once registered, however, the fraudulent liens are very burdensome to remove. . . .  [Sovereign citizens adherents] have filed these commercial liens with state departments of revenue, departments of state, or other the state agencies responsible for receiving and recording these financial instruments.  Further investigation revealed that various publications were advocating the exploitation of the UCC filing process and provided explicit instructions on how to perfect these fraudulent security interests, including sample financing statements forms.  [These publications are built on] the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman." . . .  Redemptionists claim that government has power only over the strawman and not over the live person, who remains free [and, thus,] individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman.  Thereafter, [pursuant to this "theory,"] the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody.  If government officials refuse, [adherents of this scheme file] liens against [government officials].  Adherents of this scheme also advocate that [they] copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

*See* Fed. R. Evid. 902(6).  Nevertheless, the articles are still subject to being stricken on the ground that they contain  hearsay.  *See* Mitchell v. McNeil, No. 09-22866-CIV, 2010 WL 3222114 (S.D. Fla. Aug. 16, 2010).  To the extent the articles are offered to prove the truth of the matters asserted therein, for which Defendants have offered no applicable hearsay exception, the court concludes the articles are not admissible.  To the extent, however, the articles are offered to show the effect of their content on the FDOC, i.e., that based on factors discussed in the articles, the FDOC "considers sovereign citizens to be a Security Threat Group (STG)," as to which the FDOC "strives to curtail, limit and restrict the exposure, presence and the appearance of legitimacy . . ." (doc. 299-12, ¶ 7, declaration of FDOC Correctional Programs Administrator Michelle Jordan ("Ms. Jordan")), the articles are not hearsay but rather, for this purpose, should be admissible.  *See* United States v. Trujillo, 561 F. App'x 840, 842 (11th Cir. 2014) (newspaper articles regarding criminalization of mortgage fraud and arrest of persons for mortgage fraud which defendant emailed to her personal account and then forwarded to another person were not hearsay because they were not admitted for their truth but rather to show their effect on defendant—"that she was scared to see people going to jail for participating in mortgage-fraud schemes").  Therefore, Plaintiff's objections to the *FBI Law Enforcement Bulletin* and Southern Poverty Law Center articles cited by Defendants (docs. 299-13–15) should be denied, and the articles considered, to the extent set forth above.

Next, the court addresses Plaintiff's challenges to Ms. Jordan's declaration, including that it lacks a proper foundation, is conclusory and speculative, fails to identify facts material to the issues at bar, and fails to show a nexus and relevance to "said materials issues at issue under the 4 prongs of Turner" (doc. 364 at 5, 20–22).  In her declaration, which the court outlines more fully

---

*Id.* at 203 and nn.3 & 4.  *See also* United States v. Benabe, 654 F.3d 753, 761–67 (7th Cir. 2011) (describing the conduct of sovereign citizens).  In a criminal case, the Eleventh Circuit also recently commented that courts "repeatedly have been confronted with sovereign citizens' attempts to delay judicial proceedings, and summarily have rejected their legal theories as frivolous."  United States v. Sterling, 738 F.3d 228, 233 n.1 (11th Cir. 2013), *cert. denied*, ____U.S.____, 134 S. Ct. 2682, 189 L. Ed. 2d 224 (2014).

Plaintiff states that he "is NOT, has NEVER been a sovereign citizen of USA" but rather is a "native and citizen of Jamaica, W.I." (doc. 364 at 5) (emphasis in original).  Plaintiff does not, however, disavow the sovereign citizens movement or its philosophy, and in his complaint and motion for summary judgment he appears to rely on the movement's teachings (*see, e.g.*, doc. 120 at 13, ¶ 8a, in which Plaintiff asserts that Defendants have denied him "self-help under UCC," and doc. 302 at 7, ¶ 34, in which Plaintiff alleges that Defendants and their counsel have engaged in a conspiracy to hold Plaintiff as collateral for assets worth $523,209,000,000.00 which are being traded via the Fidelity Advisor Global Balanced I-Fund (#14)).

later in this Report, Ms. Jordan describes her professional background and expertise.  This includes her role as supervisor of the FDOC's STG Unit, in the Office of Inspector General, which monitors gang-related activity inside prisons and in probation services to identify gangs and other STGs and analyzes their activities to assess the threats to the security and order of FDOC institutions (doc. 299-12 at 1–2, ¶¶ 1–4).  She references factors, which are discussed in the *FBI Law Enforcement Bulletin* and Southern Poverty Law Center articles, that have caused the FDOC to consider sovereign citizens a STG and to identify and prohibit as contraband certain sovereign citizens-related materials (*id.* at 2–3, ¶¶ 5–9).  Ms. Jordan also states that, with respect to Plaintiff's instant complaint, she reviewed the LRC's records regarding its rejection of the three publications at issue, including "the relevant content" of the publications (*see id.* at 3,  ¶¶ 10–11 and ¶ 10, n.1), and concluded they pose an institutional security threat (*id.* at 4, ¶ 12).

Ms. Jordan's declaration is sufficient to establish that she has the professional background and competence to testify on the matters stated in the declaration and that she made the declaration on her own personal knowledge.  The declaration also sets out material, relevant facts that provide a foundation for a reasoned and knowledge-based—rather than conclusory and speculative—explanation as to why the FDOC considers the sovereign citizens movement to be a STG and why it prohibits as contraband sovereign citizens-related materials such as the materials at issue in this case.  In short, the declaration meets the requirements of Federal Rule of Civil Procedure 56(c)(4).  Plaintiff's objections to Ms. Jordan's declaration should therefore be overruled.

Finally, the court addresses the various orders from other courts that Defendants, and Plaintiff, have supplied with their motion.  Pursuant to Federal Rule of Evidence 201, for the purpose of recognizing judicial action or the litigation's subject matter, courts may take judicial notice of other courts' orders.  *See* In re Delta Resources, Inc., 54 F.3d 722, 725 (11th Cir. 1995); *see also* United States v. Berrojo, 628 F.3d 368, 369 (5th Cir. 1980) (stating that "The doctrine of judicial notice permits a judge to consider a generally accepted or readily verified fact as proved without requiring evidence to establish it."); In re Salem, 465 F.3d 767, 771 (7th Cir. 2006) (taking judicial notice of state court dockets and opinions); Dawson v. Mahoney, 451 F.3d 550, 551 (9th Cir. 2006) (taking judicial notice of state court orders and proceedings).  The parties have submitted or referenced orders—from state courts and a federal bankruptcy court—in support of their positions

(*see* doc. 333-1 at 9–11, 12–13, 14–16, 16–17 and doc. 364-1 at 45–46).  To the extent the court

finds these cases relevant, it takes judicial notice of them in its discussion below.

## VI.   SUMMARY JUDGMENT FACTS[10]

There can be no substantive or genuine dispute regarding the following facts.  On August

13, 2008, the Martin Correctional Institution ("MCI") mailroom received a copy of "The ACD

Packet—Administrative Claim for Damages" and a copy of "New Conditional Acceptance for Value

for Proof of Claim" addressed to an inmate housed at that facility (docs. 299-2, 299-3).  The two

texts were impounded, as set forth in Notices of Rejection or Impoundment of Publications given

to the inmate, "pending review by the Department's Literature Review Committee[11], because the

Warden or designee believes that the publication may contain subject matter that is inadmissible per

---

[10] These facts are taken from the parties' summary judgment materials of record, *see* Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1, including Defendants' exhibits that are listed above in n.7.  Plaintiff's exhibits attached to his motion for summary judgment include:

| | |
|---|---|
| Doc. 302 at 12–15 | DC5-101 to Nyka O'Connor dated September 30, 2008 [2 forms] |
| Doc. 302 at 17–18 | DC5-101 to Nyka O'Connor dated October 9, 2008 |
| Doc. 302 at 20–21 | Attachment to Defendants' Answers to Interrogatories |
| Doc. 302 at 23 | Rule 33-602.203(7), Fla. Admin. Code |
| Doc. 302 at 25–32 | Plaintiff's Grievances/Responses/Copy Request |
| Doc. 302 at 34 | Disciplinary Report Log |
| Doc. 302 at 36 | Defendants' Answers to Interrogatories |
| Doc. 302 at 38 | Defendants' Answer to Sixth Amended Complaint |
| Doc. 302 at 40 | Defendants' Answers to Interrogatories |

Plaintiff also attached to his response to Defendants' motion the following exhibit which is not otherwise duplicated in his other exhibits:

| | |
|---|---|
| Doc. 364-1 at 45–46 | Order in <u>O'Connor v. Sec., Fla. Dept. of Corrections</u>, No. 14421-B (11th Cir. Feb. 23, 2015) (denying certificate of appealability re: denial of habeas petition pursuant to 28 U.S.C. ¶ 2254) |

Plaintiff signed the Sixth Amended Complaint under penalty of perjury.  Therefore, the Sixth Amended Complaint may also be used as an opposing affidavit to the extent it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See* <u>Perry v. Thompson</u>, 786 F.2d 1093, 1095 (11th Cir. 1986); <u>Sammons v. Taylor</u>, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[F]acts alleged in an inmate's sworn pleading are sufficient and . . . a separate affidavit is not necessary."); *see also* 28 U.S.C. § 1746 (setting forth requirements for unsworn declarations under penalty of perjury).

[11] The LRC is the FDOC's final reviewing authority for appeals regarding impounded or rejected reading materials.  *See* Rule 33-501.401 (14), Fla. Admin. Code (2010).

Section (3) of Rule 33-501.401 FAC" (*id.*).[12]  More specifically, the Notices reference Rule 33-501.401(3)(f)(l) and, in a blank section intended to be used to provide additional details about the material believed to be inadmissible, state that pursuant to the criteria established in Section (3), "[t]he entire publication instructs and explains how to establish a fraudulent lien claim[] against individuals, such as wardens, corrections officers, judges and other officials in an effort to harass and damage their credit rating" (*id.*).

On September 22, 2008, the SRCI mailroom received a copy of "The ACD Packet— Administrative Claim for Damages" and a copy of "New Conditional Acceptance for Value for Proof of Claim" addressed to Plaintiff (doc. 299-5 at 2–5; doc. 302 at 12–15).[13]  On September 30, 2008, a mailroom official issued Notices impounding the two publications pending review by the LRC on the stated ground that the publications had been impounded at another institution (*id.*).[14] The Notice of Rejection or Impoundment of Publications forms given to Plaintiff reference Rule

---

[12]  Rule 33-501.401(3) in part provides that inmates may receive publications, with certain exceptions:

(3)   Inmates shall be permitted to receive and possess publications per terms and conditions established in this rule unless the publication is found to be detrimental to the security, order or disciplinary or rehabilitative interests of any institution of the department . . . or when it is determined that the publication might facilitate criminal activity.  Publications shall be rejected when one of the following criteria is met:

***

(f)  It encourages or instructs in the commission of criminal activity;

***

(m)  It otherwise presents a threat to the security, order or rehabilitative objectives of the correctional system or the safety of any person.

Rule 33-501.401(3)(f)(m), Fla. Admin. Code (eff. Nov. 22, 2010).

The version of Rule 33-501.401 that was in effect in 2008, when Plaintiff's claims arose, contained the same pertinent substantive provisions, although subsection (3)(m) of the current rule was then identified as subsection (3)(l). *See* Rule 33-501.401(3)(f)(l), Fla. Admin. Code (eff. Aug. 1, 2006).  For consistency, throughout this Report, the court refers to the earlier numbering of this Rule, in other words, Rule 33-501.401(3)(l) rather than Rule 33-501.401(3)(m).

[13]   The initial reason given for rejecting the "New Conditional Acceptance for Value for Proof of Claim" on September 23, 2008, was that it had an impermissible metal or spiral binding (doc. 299-4 at 2).

[14]  Rule 33-501.401(8)(c) in part provides that "[t]he impoundment of a publication by a warden or authorized designee of any correctional facility of the department shall result in that publication being impounded at all correctional facilities until such time as the literature review committee reviews the action."  Rule 33-501.401(8)(c), Fla. Admin. Code (eff. Nov. 22, 2010).  Subsection (8)(c) of the current rule was identified as subsection (9)(c) of the version of the Rule that was in effect in 2008.  *See* Rule 33-501.401(9)(c), Fla. Admin. Code (eff. Aug. 1, 2006).

33-501.401(3)(f)(l) and state that pursuant to the criteria established in Section (3), "[t]he entire publication [or book] instructs and explains how to establish fraudulent lien[s] against wardens, corrections officers, judges and other officials in an effort to harass and damage their credit rating" (*id.*). On October 2, 2008, the LRC met and reviewed the "New Conditional Acceptance for Value for Proof of Claim" and "The ACD Packet—Administrative Claim for Damages" (docs. 299-6–8; *see also* doc. 120, ¶¶ 2, 3). The LRC decided that both publications instructed in the commission of criminal activity and therefore rejected them pursuant to Rule 33-501.401(3)(f) (*id.*).

The SRCI mailroom received a copy of the September/October 2008 issue of a TAB periodical for Plaintiff on September 22, 2008, the same day the two other TAB publications addressed to Plaintiff arrived. The TAB periodical was impounded via a Notice dated October 9, 2008, "pending review by the Department's Literature Review Committee, because the Warden or designee believes that the publication may contain subject matter that is inadmissible per Section (3) of Rule 33-501.401 FAC" (doc. 299-9; doc. 302 at 17–18). More specifically, the printed portion of the Notice references Rule 33-501.401(3)(f)(l); in the blank section of the Notice to provide additional details about the material believed to be inadmissible, a mailroom employee typed "PER THE LITERARY REVIEW COMMITTEE ALL AMERICAN BULLETIN PUBLICATIONS WILL BE BANNED PENDING REVIEW" (*id.*) (capitalization in original). The LRC met on November 6, 2008, at which time they reviewed the September/October 2008 issue of the TAB newspaper (docs. 299-10–11; *see also* doc. 120 at ¶ 13). In rejecting the publication, the Committee cited Rule 33-501.401(3)(l), and it justified its decision by stating that the issue "instructed in the commission of criminal activity, to wit: fraud" (*id.*). To date, Plaintiff has not been permitted to receive or possess the "New Conditional Acceptance for Value for Proof of Claim," "The ACD Packet—Administrative Claim for Damages," or the September/October 2008 issue of TAB newspaper (doc. 302 at 6, ¶ 30) or any other TAB materials or materials with similar content (*id.* at 2, ¶ 11; doc. 333 at 5, ¶ 30).

VII.    DISCUSSION

Eleventh Amendment Immunity

Defendants claim that the Eleventh Amendment immunity bars Plaintiff's § 1983 claims for damages against them in their official capacities.  Absent waiver or express congressional abrogation, the Eleventh Amendment prohibits a suit brought by a private individual against a state in federal court.  *See* Federal Maritime Commission v. South Carolina State Ports Authority, 535 U.S. 743, 765–78, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002); Kentucky v. Graham, 473 U.S. 159, 167, n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); Gamble v. Florida Department of Heath and Rehabilitative Services, 779 F.2d 1509, 1511 (11th Cir. 1986).  A suit against a state employee in his or her official capacity is deemed to be a suit against the state for Eleventh Amendment purposes.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).  A plaintiff may not bring a § 1983 action for monetary damages against the state or state officials in their official capacities.  Miller v. King, 384 F.3d 1248 (11th Cir. 2004).  Thus, insofar as Plaintiff sues Defendants in their official capacities, Defendants are entitled to Eleventh Amendment immunity from damages.

Limitation on Damages

Defendants argue that Plaintiff's damages on his First Amendment claim are limited under Title 42 U.S.C. § 1997e(e), which provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  The Eleventh Circuit has decided that the phrase "Federal civil actions" means all federal claims, including constitutional claims.  Napier v. Preslicka, 314 F.3d 528, 532 (11th Cir. 2000) (citing Harris v. Garner, 216 F.3d 970, 984–85 (11th Cir. 2000) (*en banc*)).  Where a prisoner plaintiff alleges constitutional violations—including First Amendment violations—he is prevented under § 1997e(e) from seeking punitive or compensatory damages in the absence of a physical injury.  Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007) *abrogated on other grounds by* Sossamon v. Texas, 563 U.S. 277, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (U.S. 2011)); *see also* Al-Amin v. Smith, 637 F.3d 1192, 1199 (11th Cir. 2011) (noting that Napier court, by affirming dismissal of Napier's entire claim, "concluded, albeit *sub silentio*, that Napier's

punitive claim was barred by § 1997e(e) just as much as his compensatory claim."). Nominal damages, however, may still be recoverable. Smith, 502 F.3d at 1271.

Plaintiff in this case asserts damages for mental and emotional harm for his claims under the First Amendment as to which he does not—and cannot—allege physical injury. Accordingly, the punitive and compensatory damages Plaintiff seeks are unavailable to him.

First Amendment Claim

Prisoners have a First Amendment right to send and receive mail. See Thornburgh v. Abbot, 490 U.S. 401, 407, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989); see also Al-Amin v. Smith, 511 F.3d 1317, 1333 (11th Cir. 2008) (stating that "[m]ail is one medium of free speech, and the right to send and receive mail exists under the First Amendment."). The First Amendment also protects the right to receive and possess newspapers and similar publications. See Beard v. Banks, 548 U.S. 521, 543, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006) (J. Stevens, dissenting). Prison officials nevertheless may adopt rules that infringe on a prisoner's First Amendment rights as long as those rules are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). The four Turner factors are: "(1) whether there is a valid, rational connection between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an exaggerated response to prison concerns." Hakim v. Hicks, 223 F.3d 1244, 1247–48 (11th Cir. 2000) (internal quotation marks omitted). These factors are applied when assessing most prison regulations, including those concerning incoming mail received by inmates. Thornburgh, 490 U.S. at 413. See also Perry v. Sec'y, Florida Dep't of Corr., 664 F.3d 1359, 1365 (11th Cir. 2011); Prison Legal News v. Jones, ___F. Supp. ____, 2015 WL 5047957, at * 13 (N.D. Fla. Aug. 27, 2015). Following Turner, the Eleventh Circuit has accorded "wide-ranging" and "substantial" deference to prisoner administrators in their execution of policies and practices that they consider necessary to preserve internal order and discipline and to maintain institutional security, Al-Amin, 511 F.3d at 1328, in light of "the complexity of prison management, the fact that responsibility therefor is necessarily vested in prison officials, and the fact that courts

are ill-equipped to deal with such problems."  Lawson v. Singletary, 85 F.3d 502, 510 (11th Cir. 1996).  With respect to application of the four Turner factors, the burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."  Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2168, 156 L. Ed. 2d 162 (2003).

The parties dispute whether the FDOC has imposed a total ban on all TAB or similar items. Plaintiff contends the FDOC enforces a "blanket ban" on such materials, which was imposed through the October 9, 2008, Notice and the LRC's November 2008 approval of the Notice (doc. 302 at 2, ¶¶ 10,11).  Defendants deny that a total ban of such materials resulted from these actions (doc. 333 at 2–3, ¶ 25).  Plaintiff also asserts that Rule 33-602.203(7)[15] "supports" the blanket ban by prohibiting "forms for filing valid UCC papers, law terms such as strawman, HJR-192 (House Joint Resolution 192), Redemptive Process, Acceptance for Value, and the like" (doc. 302 at 3, ¶ 13; see also id. at 5, ¶ 26).  Defendants acknowledge the restriction of contraband imposed by Rule 33-602.203(7) but contend the Rule does not create a blanket ban on any specific publications by name (doc. 333 at 3, ¶ 26).  Moreover, they contend, it is too late for Plaintiff to complain about Rule 33-602.203(7), because he waited until summary judgment to do so and they do not consent to his untimely pursuit of this theory of liability (id.).

The only Rule mentioned by Plaintiff in the Sixth Amended Complaint in apparent support of his allegation that the FDOC imposes a total ban of all TAB, UCC, and materials with like content, is Rule 33-501.401, which Plaintiff cites without identifying any specific subsections.  No part of Rule 33-501.401, however—either in the August 1, 2006, version that was in effect at the time the events in this case occurred or the present version that has been in effect since November 22, 2010—provides for a total ban of any inmate reading materials.  To the contrary, the two

---

[15] This subsection provides:

(7) No inmate shall manufacture or possess any forms that may be used in the fraudulent filing of Uniform Commercial Code liens and/or publications that promote this practice.  An inmate shall not possess any Uniform Commercial Code (UCC) Article 9 form, including but not limited to any financing statement (UCC1, UCC1Ad, UCC1AP, UCC3, UCC3Ad, UCC3AP), or correction statement (UCC5), whether printed, copied, typed or hand written, or any document concerning a scheme involving an inmate's "strawman," "House Joint Resolution 192 of 1933," the "Redemptive Process," "Acceptance for Value" presentments or document indicating copyright or attempted copyright of an inmate's name absent prior written authorization from the warden.

Rule 33-602.203(7), Fla. Admin. Code (2014).

relevant subsections (which are identical in both the August 1, 2006, and November 22, 2010, versions of Rule 33-501.401) indicate there is no complete ban on any specific periodicals or texts, including those from TAB or similar publishers.  Subsection (5) [formerly subsection (6)] of Rule 33-501.401, states that periodical subscriptions cannot be totally rejected; rather, each issue of the subscription must be reviewed separately, with impoundment or rejection to be based on the criteria established in subsection (3).  Moreover, as may be applicable to books and similar publications, under Rule 33-501.401(7) [formerly subsection (8)], previously-rejected publications may later be approved if the publisher presents proof to the LRC that the publication has been revised to exclude the offending material.  In short, Plaintiff has failed to point to, and cannot point to, any part of Rule 33-501.401—either as the Rule existed at the time the events giving rise to his claim occurred or at the present time—that supports his contention that a total prohibition on TAB or like materials currently exists and has existed since at least 2008.

Defendants are correct in stating that not until summary judgment did Plaintiff cite Rule 33-602.203(7) in support of his allegation that the LRC enforces a total ban of TAB and similar reading materials.  The court can only consider the theories of liability that Plaintiff actually pleaded in the Sixth Amended Complaint.  *See*, e.g., Thews v. Wal–Mart Stores, Inc., 560 F. App'x 828, 830 (11th Cir. 2014) (refusing to consider a theory of negligence that was not alleged in the complaint).  Federal pleading standards do not allow a party "to raise new claims at the summary judgment stage . . . .  Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of the facts set forth in the complaint."  Gilmore v. Gates, McDonald & Co., 382 F.3d 1312, 1314–15 (11th Cir. 2004).  In this case, however, the court questions whether, with respect to Plaintiff's late citation of Rule 33-602.203(7), Defendants in fact have been  required to infer an entirely new claim relying on an entirely new theory of liability.  The essential facts of the Sixth Amended Complaint are the same with respect to both Rules, and it does not appear that Defendants face significantly different burdens or defenses in addressing Plaintiff's First Amendment claim under Rule 33-602.203(7) than they have under Rule 33-501.401.  Nevertheless, regardless of whether Plaintiff has in fact impermissibly asserted an entirely new theory of liability, the court concludes that Plaintiff's reliance on Rule 33-602.203(7) is unavailing.

Rule 33-602.203(7) first went into effect on November 28, 2011, and thus was not in place

and could not have been applied in 2008 when mail room staff impounded Plaintiff's items and the LRC approved rejecting them. As to any current application, Rule 33-602.203(7) does not impose a complete ban on TAB and similar items. Rather, under this Rule inmates are only prohibited from making or possessing "forms that may be used in the fraudulent filing of Uniform Commercial Code liens and/or publications that promote this practice." Thus TAB publications and other similar publications that do *not* contain such materials are not prohibited. Furthermore, subsection (7) provides that, with prior written authorization from the warden, an inmate may be permitted to possess certain UCC forms and other materials. In sum, Rule 33-602.203(7) does not impose an all-inclusive, or blanket ban, of TAB publications and materials or similar items.

Additionally, the undisputed record evidence, including evidence submitted by Plaintiff, reflects that there is no complete ban of TAB or similar reading materials in place. Specifically, in response to Plaintiff's interrogatories, Defendant Milliken responded repeatedly that no such blanket ban exists and that all publications are considered on a case-by-case basis (*see* doc. 302 at 36, ¶¶ 4–7). Plaintiff argues otherwise but has come forward with no evidence to support his position, other than his own speculative assertions. Conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba, 419 F.3d at 1181. Also, an exhibit submitted by Plaintiff, which appears to be a list of impounded items considered by the LRC for rejection or admission (*id.* at 20), reflects that two TAB publications, from 2007 and 2008, were approved, as were several publications from "American's Sovereign Bulletin" from 2010 and 2011[16] (*id.* at 20–21; *see also* doc. 299-16).

Additionally, the statement on the October 9, 2008, Notice of Rejection or Impoundment of Publications for the September/October 2008 TAB periodical ("PER LITERARY REVIEW COMMITTEE ALL AMERICAN BULLETIN PUBLICATIONS WILL BE BANNED PENDING REVIEW") (doc. 302 at 17–18), does not support Plaintiff's claim of a total ban on all TAB publications. The phrase "pending review" implies a temporary status, not a permanent one. Moreover, the mailroom worker did not purport to have, and did not have, the authority to impose a permanent ban on any publications. Her use of the term "banned pending review" by the LRC in the Notice, instead of the term "impounded pending review," appears to have been careless or

---

[16] As of December 2010, it appears that The American's Bulletin was renamed The American's Sovereign Bulletin. *See* Wright V. American's Bulletin Newspaper Corp., No. CV 10-6118-PK, 2010 WL 5393530, at *3 n.4 (D. Or. Dec. 22, 2010).

inadvertent.   In any event, it is without significance.   Nor did the LRC's approval of the impoundment in the Notice result in imposing any "ban" referenced by the mailroom worker. Rather, the LRC's action with respect to Plaintiff on November 6, 2008, was limited to rejecting the September/October 2008 issue of the TAB newspaper, under Rule 33-501.401(3) (doc. 299-11).   In short, the court finds that there is no genuine issue of disputed fact as to whether the FDOC has enforced or continues to enforce a total ban on all TAB or similar materials.   The record evidence instead supports a finding that no such blanket prohibition exists or has existed.

In light of the above conclusion, there is no occasion to apply the four-factor <u>Turner</u> standard to Plaintiff's contention that the LRC enforces a total ban on TAB and similar reading materials and has done so since at least 2008.   The court thus proceeds to considering whether, under the <u>Turner</u> factors, the restrictions in Rule 33-501.401(3)(f)(l)—pursuant to which Plaintiff's three TAB materials were rejected in 2008—are reasonably related to legitimate penological interests.   Because the analysis is essentially the same, the court also briefly discusses Rule 33-602.203(7).

The court has thoroughly considered Ms. Jordan's declaration, which reflects that she reviewed the LRC's decisions and relevant content of the publications at issue, "The ACD Packet—Administrative Claim for Damages," the "New Conditional Acceptance for Value for Proof of Claim," and the September/October 2008 issue of the TAB newspaper.   Her declaration references the U.S. Department of Justice's definition of sovereign citizens as a domestic terrorist movement comprised of a network of loosely affiliated individuals who hold extremist beliefs that federal, state, and local governments are operating illegitimately, and subscribe to a number of additional conspiracy theories.   In addition, she notes that sovereign citizens engage in many fraudulent financial schemes, often targeting government officials with various tactics used to harass, intimidate, and psychologically threaten them.   According to the declaration, these tactics include creating fraudulent liens representing a fabricated debt supposedly owed by the government official to the sovereign citizen (doc. 299-12 at 2, ¶ 5).   Further, the federal government reports that sovereign citizens in prison recruit and train new individuals, use legal resources available in prison to craft new pseudo-legal theories, and create fraudulent businesses or engage in identity theft to obtain lines of credit from legitimate banks (<i>id.</i> at ¶ 6).   Ms. Jordan also references the Southern Poverty Law Center's report that in 2011 there were an estimated 300,000 Americans using

sovereign citizen techniques, a number that is increasing due in part to the movement's proliferation in prisons (*id.*).

According to Ms. Jordan, "[b]ased on these and other factors, the [FDOC] considers sovereign citizens to be a Security Threat Group (STG)," and the FDOC "strives to curtail, limit and restrict the exposure, presence, and the appearance of legitimacy of sovereign citizens as well as that of other STGs, in the state prison system" (doc. 299-12 at 2, ¶ 7). Ms. Jordan further states that the FDOC considers and prohibits as contraband any item that depicts a sign, symbol, logo, or other identifiers or references, such as codes, to a gang, group or organization identified by the department as posing a threat to the safety and security of the institution (*id.* at 2–3, ¶9). The FDOC also considers and prohibits as contraband any material that instructs in the commission of criminal activity, as a threat to the security and good order of the prisons (*id.*). These prohibitions are incorporated into the FDOC's rules regarding contraband and admissible reading materials, among other provisions (*id.*). Prohibiting items that affiliate an inmate with a criminal organization, promote or facilitate recruiting and training new members, and instruct in criminal activity assists the FDOC in reducing frictions between various gang organizations, as well as improving the chances for rehabilitation of inmates in a setting free of criminal ties and influences (*id.*).

Specifically with respect to the two TAB texts that were rejected, Ms. Jordan states that her review of the FDOC records, including reading excerpts of the rejected publications at issue, revealed that they instruct in creating and using pseudo-legal documents and theories outside of the court system to create a debt or other means of harassment and retaliation against government officials for enforcing laws the sovereign citizens consider inapplicable to them (doc. 299-12 at 3, ¶ 10). Ms. Jordan also concluded that the September/October 2008 issue of TAB was appropriately rejected because it contains articles reporting the tactics and documents used by sovereign citizens engaging in confrontations with police, interfering with the rights of real estate titleholders, and undermining the authority of government officials (*id.* at ¶ 11). The issue also contains advertisements selling sovereign citizens movement identification cards and instructions for evading federal and state income taxes and circumventing foreclosure, criminal prosecution, and other valid legal processes (*id.*). In Ms. Jordan's opinion, all three publications were appropriately rejected by the LRC because the publications pose security threats if an inmate were allowed to possess them,

and the publications also likely could be used by other sovereign citizen inmates to help them recruit and train new members in their fraudulent and harassing tactics (*id.* at 4, ¶ 12).

In this case, the first consideration under <u>Turner</u> pertains to whether there is a valid, rational connection between rules that prevent inmates from possessing certain publications and legitimate governmental interests put forward to justify such action.  There can be no question but that the FDOC has a legitimate governmental interest in promoting institutional security by controlling and reducing criminal activity by inmates.  *See* <u>Thornburgh</u>, 490 U.S. at 415 (holding that regulation promulgated with the purpose of "protecting prison security" is legitimate, since that "purpose . . . is central to all other corrections goals"); <u>Perry</u>, 664 F.3d at 1366 (acknowledging that "protecting the public and ensuring internal prison security" are legitimate penological interests).  The security interest in controlling inmates' criminal activities reasonably encompasses preventing inmates from committing fraud through the misuse of UCC forms or other, similar acts.

As noted, Rule 33-501.401(3)(f) prohibits publications that encourage or instruct in the commission of criminal activity and subsection (l) of Rule 33-501.401(3) prohibits publications that represent a security threat.  Plaintiff contends that an issue of fact exists with respect to whether the materials in fact instruct in criminal activity.  Central to what the court must consider, however, is whether Defendants' beliefs concerning the publications and the need to restrict them to avert potential security threats and thwart criminal activity are rational.  <u>Livingston</u>, 683 F.3d at 216 ("[P]rison policies may be legitimately based on prison administrators' *reasonable assessment of potential* dangers") (emphasis added).  Based on the statements in Ms. Jordan's declaration—as to which Plaintiff has submitted no contradicting evidence—along with its own familiarity with sovereign citizens theories and practices, *see* n.9, *supra*, and its review of the publications at issue (*see* doc. 306 (sealed) and synopses at docs. 327, 336)—the court is satisfied that the FDOC's beliefs and position are reasonable.   There is a valid and rational connection between Rule 33-501.401(3)(f)(l) and the reduction in criminal activity or security threats through prohibiting reading materials that specifically instruct in criminal activity or pose a threat to the safety and orderly administration of the penal institution.   Similarly, it is evident that a valid, rational connection exists between Rule 33-602.203(7) and controlling criminal conduct and maintaining institutional security and safety by classifying materials that instruct in criminal activity—such as forms that may be used in the fraudulent filing of UCC liens or publications that promote the

practice—as contraband.  Thus Plaintiff is unable to establish a genuine issue of fact with respect to the application of Rule 33-501.401(3)(f)(l)—or Rule 33-602.203(7)—to reject his publications. The first <u>Turner</u> factor therefore favors Defendants.

Plaintiff also has not raised a genuine issue of material fact with respect to the second <u>Turner</u> factor, which requires the court to consider whether alternative means of exercising the asserted constitutional right remain available.  Here, that right involves the receipt and possession of reading materials.  When considering whether alternative means of exercising the abridged right remain open to a plaintiff, the Supreme Court instructs courts to view the right in question "sensibly and expansively." <u>Thornburgh</u>, 490 U.S. at 417.  This means that the alternatives need not be perfect substitutes.  *See* <u>Livingston</u>, 683 F.3d at 218.  As Defendants submit, there is no possible alternative under which inmates could be permitted to have materials that instruct in the commission of fraud and promote extremist anti-government beliefs, as such activities inherently pose a threat to prison safety and security.  Moreover, as discussed previously, there is no evidence that the FDOC imposes a "blanket ban" on any publications, including TAB publications.  Thus fiction and nonfiction publications of all types—from novels to legal texts to texts on religion, economics, politics, philosophy, etc.—remain available to Plaintiff and other inmates from various sources, provided the reading materials are not otherwise  prohibited due to valid security concerns.  This availability of a wide variety of reading materials includes TAB publications as well.  Indeed, as noted previously, Plaintiff's own evidence shows that between 2007 and 2011 the LRC approved for admission several TAB publications (*see* doc. 302 at 20–21).  Moreover, Rule 33-602.203(7) provides that an inmate may even be permitted to possess certain UCC forms with the warden's prior written permission.

The choice and availability of alternative reading materials need not be ideal, from Plaintiff's perspective, in order for availability to adequately satisfy the concerns raised by the second <u>Turner</u> factor.  *See* <u>Overton</u>, 539 U.S. at 135 ("Alternatives . . . need not be ideal, however; they need only be available.").  "Where 'other avenues' remain available for the exercise of the asserted right, the courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." <u>Turner</u>, 482 U.S. at 90 (citations omitted).  With that guidance in mind, the court must conclude that application of Rule 33-501.401(3)(f)(l) to preclude Plaintiff's receipt and possession of "The ACD Packet—Administrative Claim for

Damages," the "New Conditional Acceptance for Value for Proof of Claim," and the September/October 2008 issue of TAB pursuant was not unreasonable.  The application of Rule 33-602.203(7) with respect to any current prohibition yields the same result.  The second <u>Turner</u> factor therefore tilts toward Defendants.

Under the third <u>Turner</u> prong, the court must consider whether and to what extent accommodation of the asserted right would impact prison staff, inmates, and the allocation of prison resources generally.  Defendants' contention that permitting the receipt of materials that instruct in criminal activity would adversely affect staff, other inmates, and prison resources is well-taken. Whether prohibited under Rule 33-501.401(3) or Rule 33-602.203(7), possession of such materials could facilitate inmates' filing fraudulent liens against staff as well as members of the public and assist in the recruitment and training of other inmates in such unlawful practices, thereby also undermining the inmates' rehabilitation.  The FDOC could be forced to make even greater expenditures in terms of manpower and money to combat the effects of these activities.  For these reasons, the third <u>Turner</u> factor therefore also favors Defendants.  *See* <u>Thornburgh</u>, 490 U.S. at 418 (stating that, with respect to the third <u>Turner</u> factor, courts should defer to "the informed discretion of corrections officials" where excluded publications are "limited to those found potentially detrimental to order and security" and the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike").

The fourth, and last, <u>Turner</u> factor is whether "easy alternatives" exist to the rule at issue because "easy alternatives" suggest that the rule is not a reasonable response to legitimate prison concerns but rather an improper "exaggerated" one.  <u>Turner</u> 482 U.S. at 90.  Prison officials are not required to adopt the "least restrictive alternative."  *Id.* at 90–91.  Nevertheless, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Id.* at 91.  Here, Plaintiff has made no effort to do so. Also, as the court has already noted, no easy alternatives exist to receipt of publications which present a threat to institutional safety and security and there is no evidence of a total ban on all sovereign citizens or like publications.  Rather, publications are independently evaluated with, as noted above, some TAB publications having been allowed.

Defendants submit that the holding in <u>Jones v. Caruso</u>, 569 F.3d at 258, in which the Sixth Circuit affirmed the granting of a preliminary injunction to preclude prison authorities from enforcing a specific rule ("Rule 23") to regulate inmates' possession of UCC-related materials, actually "bolsters the proposition that FDOC has the ability to reject the subject publication[s]" (doc. 333 at 23).   The appellate court affirmed the lower court's ruling in part because "effective rules" ("Rule 3" and "Rule 7") had "been developed that allow prisoners to receive a broad range of UCC-related materials while still limiting fraudulent filings."   <u>Jones</u>, 569 F.3d at 272–73. According to Defendants, "[t]he rules that the Court found valid in <u>Jones</u> are almost identical to the rules at issue in this case, and the Court in <u>Jones</u> only enjoined Rule 23 because it felt that Rule 3 and Rule 7 adequately allowed prison officials to confiscate UCC materials" (doc. 333 at 22–23). This court agrees that Rule 3 and Rule 7 are similar to, respectively, subsections (f) and (l) of Rule 33-501.401 as that Rule was designated in 2008.[17]   Thus, to that extent, the holding in <u>Jones</u> is consistent with the FDOC's restriction of inmates' receipt and possession of  TAB and/or UCC-related publications.   Given that conclusion, Rule 33-501.401(3)(f)(l) does not represent an exaggerated response to legitimate concerns about prisoners filing fraudulent and harassing liens.[18]

---

[17]   Rule 3 prohibited "mail advocating or promoting a violation of [a] statute or federal laws," and Rule 7 prohibited mail that "is a threat to the security, good order, or discipline of the facility, may facilitate or encourage criminal activity or may interfere with the rehabilitation of a prisoner, including mail for the purpose of operating a business enterprise from within the facility." *See* <u>Jones</u>, 569 F.3d at 273. Very similarly, as has been noted above, Rule 33-501.401(3)(f) prohibits a publication that "encourages or instructs in the commission of criminal activity, and Rule 33-501.401(3)(l) prohibits a publication where "it otherwise presents a threat to the security, good order, or discipline of the correctional system or safety of any person."

[18]   Rule 23—the Rule as to which the injunction in <u>Jones</u> was upheld—prohibited "mail regarding actions that can be taken under the Uniform Commercial Code (UCC) which could be used to harass or threaten another individual, including the filing of a lien against the individual.  This does not include legal materials which set forth the statute or provide a scholarly legal analysis of the UCC."  *See* <u>Jones</u>, 569 F.3d at 262.  On its face, Rule 23—which applied to incoming mail—appears to have a similar intended effect as Rule 33-602.203(7)—which applies to items considered contraband—in that both restrict inmates' receipt or possession of UCC materials that could be used to file fraudulent and harassing liens.
    In the instant case, as noted, Rule 33-602.203(7) was not in effect at the time Plaintiff's publications were rejected in 2008 and thus is not implicated in that action.  To the extent Plaintiff is currently prohibited from possessing the publications as contraband under Rule 33-602.203(7), under the holding in <u>Jones</u> this Rule might be considered an exaggerated response to the problem of fraudulent and harassing liens being filed by prisoners.  For the reasons that follow, however, this court need not and does not follow that holding.
    First, authority from one circuit of the United States Court of Appeals is not binding upon another circuit. <u>Generali v. D'Amico</u>, 766 F.2d 485 489 (11th Cir. 1985), citing <u>United States v. Diamond</u>, 430 F.2d 688 (1970).  Thus, to the extent Rule 33-602.203(7) is inconsistent with the holding in <u>Jones</u>, <u>Jones</u> does not control here.  <u>Jones</u> also is

Also, the language of Rule 33-501.401(3)(l) is consistent with the Supreme Court's statement in Thornburgh that it was "comforted by the individualized nature of the determinations required by the regulation . . . [, which permitted exclusion only of publications found to be] 'detrimental to the security, good order, or discipline of the institution or . . . might facilitate criminal activity.'" Thornburgh, 490 U.S. at 416.

Finally, the court takes judicial notice of In re Loe, 57 Collier Bankr. Cas. 2d 1258, 20 Fla. L. Weekly Fed. B 366, 2007 WL 997581 (S.D. Fla. Mar. 29, 2007), the case cited by Defendants for the proposition that some of Plaintiff's own activities demonstrate that restriction of materials espousing sovereign citizens tenets is not an exaggerated response. The In re Loe court stated:

> The [involuntary] petition [filed under chapter 7 of the Bankruptcy Code by O'Connor] itself can only be described as utter nonsense. According to O'Conn[o]r's Official Form 5, which must be filled out correctly to commence a bankruptcy petition, Mr. Loe owes him $9,999,999,999.99. The Court has no trouble believing that this staggering sum is a blatant lie. To demonstrate the absurdity of the amount, consider that a penny short of $10 billion dollars would fetch two (2) Nimitz Class aircraft carriers and still leave almost $1 billion. It is unfathomable that Mr. Loe owes O'Conn[o]r any money at all, let alone the sum described above. Continuing on with O'Conn[o]r's ramblings, this "debt" supposedly arises from Broward County case 00–5323CF10B. That case, however, was Mr. O'Conn[o]r's criminal trial. A criminal trial cannot give rise to a civil monetary judgment against the prosecuting attorney. As such the supposed "claim" of O'Conn[o]r could not have resulted from his criminal trial.

---

distinguishable. Rule 33-602.203(7) permits inmates to possess UCC materials with the warden's prior authorization, a safety valve that Rule 23 did not contain. With this safety valve, the restriction of Rule 33-602.203(7) is less onerous and, therefore, less likely to be considered an exaggerated response. Further, this court does not consider Jones to be persuasive authority. Rather, it is more persuaded by the analysis offered in the dissenting opinion, which concluded that

> the majority's analysis and decision run directly contrary to Turner's clear and insistent teaching to let prison administrators make the difficult judgments concerning institutional operations. See Beard v. Banks, 548 U.S. 521, 531–33, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006) (reversing Third Circuit and upholding prison regulation imposing outright deprivation of newspapers, magazines and photographs even though no alternative means of access was provided, because the real task is not to "balance" Turner factors, but to determine whether the regulation is a reasonable one). The fact that Rule 23 may represent an additional mechanism (i.e., in addition to other regulations used to address the same evil) through which prison officials limit prisoners' access to potentially harmful materials does not render it an "exaggerated response." The mischief caused by fraudulent and harassing lien filings can and should be addressed in multiple and diverse ways. That the ways chosen by prison officials may turn out to be cumulative or even inefficient does not justify judicial interference.

Jones, 569 F.3d at 280 (McKeague, J., dissenting).

…

The filing of an abusive involuntary petition is odious.  The Court has no patience for a convicted criminal's attempt to use the involuntary bankruptcy process to harass public servants.

In re Loe, 2007 WL 997581, at *2 (internal citations omitted).  Plaintiff's conduct, described by the court in In re Loe as "odious," exemplifies precisely the sort of abusive activity by prisoners that the FDOC is attempting to curb through application of Rule 33-501.401(3)(f)(l) and Rule 33-602.302(7). Such Rules do not represent an exaggerated response to this serious problem.

In light of the foregoing discussion, the court is satisfied that the FDOC's application of Rule 33-501.401(3)(f)(l) to prohibit certain sovereign citizens or like materials is not an exaggerated response.[19]  The same result ensues if Rule 33-602.203(7) were applied to any current prohibition of Plaintiff's publications.  Thus the fourth Turner factor also falls in Defendants' column.

In summary, all four of the Turner factors favor Defendants.  Accordingly, the court finds that Plaintiff has not shown that prohibiting his receipt and possession of the "New Conditional Acceptance for Value for Proof of Claim," the "ACD Packet—Administrative Claim for Damages," and the  September/October 2008 issue of TAB was not "reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89; Beard, U.S. 521 at 531–33.  As Plaintiff has failed to establish a genuine issue of fact as to whether Defendants violated his rights under the First Amendment, they should be entitled to judgment in their favor on this claim.

---

[19] Plaintiff's objection to In re Loe on the ground it is "not a controlling case in light of O'Connor v. Sec. Fla. Dept. of Corrections [which found] O'Connor's claims in his [certificate of appealability] to be meritorious" (doc. 364 at 13, citing doc. 364-1 at 45) is patently incorrect and frivolous.  The Eleventh Circuit's order in O'Connor v. Sec. Fla. Dept. of Corrections makes no such finding.  Rather, the court stated the two-part standard applicable to merit a certificate of appealability and specifically found that Plaintiff had failed to satisfy the second prong.  Contrary to Plaintiff's argument, the fact that the court made no explicit finding rejecting the first prong is not equivalent to the court's having found Plaintiff's position on the first prong to be meritorious.

Qualified Immunity

Defendants assert their entitlement to qualified immunity.  Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place.  *See* Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1184 (11th Cir. 2009).  "The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'"  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).  Qualified immunity is a defense not only from liability, but also from suit, so courts should ascertain the validity of a qualified immunity defense as early in the lawsuit as possible.  *See id.*

"Under the well-defined qualified immunity framework, a 'public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting Lee, 284 F.3d at 1194). Once the official has done so, the burden shifts to the plaintiff to satisfy the following two-pronged inquiry:  (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct.  *See* Pearson, 555 U.S. at 232; *see also* Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) (the plaintiff has the burden of showing that the official is not entitled to qualified immunity).  The Supreme Court made clear in Pearson that a court need not employ a rigid two-step procedure, but rather may exercise its discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson, 555 U.S. at 236.  If no constitutional right was violated, the court need not inquire further.  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L.Ed. 2d 272 (2001).

In this case, there is no dispute that Defendants were acting in their discretionary capacities. Also, as the court has discussed, Plaintiff has failed to establish a genuine issue of fact as to whether Defendants violated his rights under the First Amendment.  Accordingly, with no violation of a

constitutional right having been shown, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.  Defendants are entitled to qualified immunity on Plaintiff's First Amendment claim.

> State Law Claims

Plaintiff was given leave to file a Sixth Amended Complaint limited to his free speech claims, along with related state law claims.  Some of Plaintiff's state law claims, which are based on the Florida Constitution, Florida statutory law, and the Florida Administrative Code, are unrelated to his free speech claims.  Moreover, at summary judgment Plaintiff has made no attempt to argue in support of these claims or submit evidence in support of them.  Nevertheless, the court addresses Plaintiff's state law claims briefly.

As an initial matter, the court notes that § 1997e(e) should apply to Plaintiff's state law claims.  The Eleventh Circuit has not specifically addressed the issue of whether punitive and compensatory damages sought by a prisoner plaintiff that are predicated upon state law claims brought in federal court are likewise precluded under § 1997e(e) absent an actual physical injury.[20] In Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312 (11th Cir. 2002), the court held that "§ 1997e(e) does not apply to prisoner lawsuits unrelated to prison conditions filed in state court based solely on state law and removed by defendants to federal court based on diversity jurisdiction." Mitchell, 294 F.3d at 1312.  Nevertheless, "[a]fter Mitchell, a defendant sued in state court on state law claims related to prison conditions who removes to federal court is not automatically precluded from moving to dismiss [under § 1997e(e)]." Napier v. Preslicka, 331 F.3d 1189, 1195 (11th Cir. 2003) (Barkett, J., dissenting from denial of rehearing en banc) (citation and internal quotation marks omitted).  It follows, under this reasoning, that a defendant who is sued

---

[20] Numerous district courts have, however, concluded that such damages are barred.  See, e.g., Jacobs v. Penn. Dept. of Corrections, No. 04–1366, 2011 WL 2295095, at *23 (W.D. Pa. June 7, 2011) (holding that prisoner's damages for mental harm based on state law claims are barred absent an actual physical injury); Schonarth v. Robinson, No. 06–cv–151, 2008 WL 510193, at *4 (D.N.H. Feb. 22, 2008) (finding that the PLRA bars recovery for mental or emotional injury under a state law claim); Hood v. Balido, No. 3:02–CV–0669, 2002 WL 1285200, at *3 (N.D. Tex. June 4, 2002) (finding that § 1997e(e)'s limitation with respect to physical injury applies to all "claims brought in federal court, not merely to claims founded on federal law.  It may thus preclude pendent state claims for emotional damages."). But see Albrecht v. Williams, Civ. A. No. 04–1895, 2009 WL 3296649, at *27 (D.N.J. Oct. 13, 2009) (doubting that § 1997e(e) applies to state law claims); Mercado v. McCarthy, Civ. A. No. 05–12124, 2009 WL 799465, at *2 (D. Mass. Mar. 25, 2009) (same); Bromell v. Idaho Dept. of Corrections, No. CIV–07–197, 2006 WL 3197157, at *5 (D. Idaho Oct. 31, 2006) (concluding § 1997e(e) does not bar a state-law claim for emotional injury).

initially in federal court on state law claims related to prison conditions should likewise not be precluded from relying on § 1997e(e).  Thus, in the instant case, § 1997e(e) should apply to Plaintiff's state law claims and bar recovery for punitive and compensatory damages for emotional or mental harm in Defendants' individual capacities.  *See also* Jacobs, 2011 WL 2295095, at *23 (noting that because the plaintiff had elected to file a federal civil action which included both federal and state law claims, "[h]e must abide by that choice, which under [§ 1997e(e)] precludes recovery for mental or emotional injury.").

Florida Constitution

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  Art. I, § 4 of the Florida Constitution also provides free speech guarantees:  "Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right.  No law shall be passed to restrain or abridge the liberty of speech or of the press. . . ."  Fla. Const., Art. I, § 4.    "The scope of the protection accorded to freedom of expression in Florida under article I, section 4 is the same as is required under the First Amendment."  Dept. of Educ. v. Lewis, 416 So. 2d 455, 461 (Fla. 1982); *see also* Florida v. Global Comms. Corp., 622 So. 2d 1066, 1075 (Fla. 4th DCA 1993); American Atheists, Inc. v. City of Starke, No. 3:05–cv–977–J–MMH, 2007 WL 842673, at *7 (M.D. Fla. Mar. 20, 2007) ("Florida courts adopt the federal interpretation of the First Amendment to the extent that it tracks the Florida Constitution.").  Accordingly, for the same reasons that Plaintiff's free speech claim against Defendants under the First Amendment fails, his claim under Article I, § 4 of the Florida Constitution likewise fails.

Negligence

In Florida, officers, employees, and agents of the state and any of its subdivisions are immune from suit in their individual capacities unless they "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Fla. Stat. § 768.28(9)(a).  At summary judgment, Plaintiff has not attempted to support his allegation in the Sixth Amended Complaint that Defendants "acted in bad faith with malicious purpose, [and] exhibited wanton & willful disregard for [Plaintiff's] rights & property" (doc. 120, Statement of Claims, ¶ 3).  Moreover, negligence does not rise to the level of bad faith, malicious purpose, or

wanton and willful disregard of human rights, safety, or property, that is necessary to sue a state employee individually.  *See* Ondrey v. Patterson, 884 So. 2d 50, 54 (Fla. 2d DCA 2004) (stating that an employee's conduct must be something greater than gross negligence in order to be actionable under § 768.28(9)(a)).  Defendants' alleged conduct was performed within the scope of each individual's employment.  To the extent Plaintiff sues Defendants their individual capacities for negligence, those claims therefore fail.  To the extent Plaintiff sues Defendants in their official capacities, those claims are likewise barred by § 768.28(9)(a), which additionally provides that "the exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity . . . ."  Fla. Stat. § 768.28(9)(a).  None of the instant Defendants is the head of the FDOC.[21]  Accordingly, the state law negligence claims against Defendants, whether in their official capacities or individual capacities, fail.

Other Claims for Relief

In the "Statement of Claims" section of the Sixth Amended Complaint Plaintiff relies on other provisions of Florida law and certain administrative rules not previously discussed, namely Fla. Stat.  §§ 20.315, 943.13(7), and 944.09, and Rule 33-208.002(3)(a).

With respect to the Florida statutes Plaintiff cites, § 20.315 authorizes the creation of the FDOC; § 943.13(7) provides that correctional and other officers employed by the State of Florida shall have a good moral character, as determined by a background check; and § 944.09 grants the FDOC the authority to adopt rules.  Plaintiff's factual allegations in the "Statement of Facts" section of the Sixth Amended Complaint provide no support for his claims for relief based on a violation of these statutes nor has Plaintiff attempted to support these claims at summary judgment. Furthermore, none of these statutes expressly creates a private cause of action for their violation, and no private cause of action should be implied.  The Florida Supreme Court has held that "legislative intent . . . should be the primary factor considered by a court in determining whether a cause of

---

[21] Plaintiff's negligence claim against Defendant Crews, acting in his official capacity as the then FDOC Secretary, was dismissed without prejudice as premature on January 27, 2014 (*see* doc. 183).  As mentioned above, *see* n.3, Plaintiff's claims against former FDOC Secretary Walter McNeil, in his individual capacity only, remain.

action exists when a statute does not expressly provide for one." Murthy v. Sinha Corp., 644 So. 2d 983, 985 (Fla. 1994); *see also* QBE Ins. Corp. v. Chalfonte Condominium Apartment Ass'n, Inc., 94 So. 3d 541, 551 (Fla. 2012) ("Since Murthy, we have reaffirmed the principle that whether a statutory cause of action should be judicially implied is a question of legislative intent."). "The primary guide in determining whether the Legislature intended to create a private cause of action is the 'actual language used in the statute.'" QBE Ins. Corp., 94 So. 3d at 551, citing Borden v. East-European Ins. Co., 921 So. 2d 587, 595 (Fla. 2006). There is nothing in the legislative intent of Chapters 20, 943, or 944, Florida Statutes, which suggests the Legislature intended to create a private cause of action for these statutes. *See* §§ 20.315, 943.085, 944.012. Finally, there also is no factual or legal basis for Plaintiff to bring a claim against Defendants under Rule 33-208.002(3)(a), a provision of the Rules of Conduct for FDOC employees which requires them to stay physically fit and mentally alert, perform their duties fairly and impartially, and otherwise conduct themselves appropriately.

## VIII.   CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment should be granted, and Plaintiff's motion for partial summary judgment should be denied.

Accordingly, it is respectfully **RECOMMENDED** that:

1.      The motion for summary judgment filed by Defendants Agerton, Milliken, Morrison, Moore,  Ontko, and Green (doc. 298), be **GRANTED**.

2.      The motion for partial summary judgment filed by Plaintiff (doc. 302), be **DENIED**.

3.      This matter be referred to the undersigned for further proceedings.

**DONE AND ORDERED** this 21st day of September 2015.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**